**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ X

SABRINA TAEKO THOMPSON, LILLIAN PAONE,
RAVEN KARLICK, ARYANA ALEXIS ANDERSON,
and SHAKA MCGLOTTEN, *on behalf of themselves*
*and all others similarly situated,*

                                        Plaintiffs,

        - against -

KATHY HOCHUL, as Governor of the State of New
York, in her individual capacity; MILAGROS PEÑA, as
President of SUNY Purchase, in her individual capacity;
WESTCHESTER COUNTY; CITY OF WHITE PLAINS;
TOWN/VILLAGE OF HARRISON; VILLAGE OF
PORT CHESTER; VILLAGE OF LARCHMONT; Chief
of the New York State University Police ("UPD")
DAYTON TUCKER, in his individual capacity; NYC
Department of Environmental Protection ("DEP")
Sergeant FRANK LYNCH, in his individual capacity;
NYC DEP Officer CHRISTOPHER SHARP, in his
individual capacity; NYC DEP Officer First Name
Unknown ("FNU")  SCHWARTZ, in his individual
capacity; UPD Inspector CINDY MARKUS, in her
individual capacity; UPD Lieutenant JAMES
MCGOWAN, in his individual capacity; UPD Officer
JAMES FOLEY, in his individual capacity; Westchester
County Officer MALIK L. BURTS, in his individual
capacity; Westchester County Officer JAVIER DEJESUS,
in his individual capacity; Westchester County Sergeant
DANIEL S. DUMSER, in his individual capacity;
Westchester County Sergeant MATHIEU E. RICOZZI, in
his individual capacity; Westchester County Lieutenant
PAUL J. CUSANO, in his individual capacity;
Westchester County Officer MICHAEL P. MAFFEI, in
his individual capacity; Westchester County Officer
ROBERT L. CAMAJ, in his individual capacity;
Westchester County Officer BRANDON A. DAY, in his
individual capacity; Westchester County Officer PAUL S.
DESOUSA, in his individual capacity; Westchester
County Officer JOHN J. SEVERI, in his individual
capacity; Westchester County Officer NICHOLAS
LOPANO, in his individual capacity; Westchester County

**Case No. 25-cv-6322**

**SECOND AMENDED**
**CLASS ACTION**
**COMPLAINT**

**JURY DEMAND**

Officer MARILENA T. SOPHIA, in her individual
capacity; Westchester County Officer ELIOT WILDER,
in his individual capacity; Westchester County Officer
RYAN G. WATTS, in his individual capacity;
Westchester County Sergeant TREVOR M. DENNIN, in
his individual capacity; Westchester County Officer
THOMAS C. OLSEN, in his individual capacity;
Westchester County Officer TUFAN S. DILSCHMANN,
in his individual capacity; Westchester County Officer
TYLER J. SMITH, in his individual capacity; Westchester
County Lieutenant BRIAN M. HESS, in his individual
capacity; Westchester County Captain JAMES B.
GREER, in his individual capacity; UPD Officer
MATTHEW ALTO, in his individual capacity and as a
representative of a defendant class of New York State
University Police Officers who violated Plaintiffs' rights
as set forth herein and who are sued in their individual
capacities; Officer GARY MCCORD Jr., in his individual
capacity and as a representative of a defendant class of
Port Chester Police Officers who violated Plaintiffs' rights
as set forth herein and who are sued in their individual
capacities; Officer OISIN MCGLOIN, in his individual
capacity and as a representative of a defendant class of
Westchester County Police Officers who violated
Plaintiffs' rights as set forth herein and who are sued in
their individual capacities; and POLICE OFFICERS
JOHN AND JANE DOE 1-10 AT UPD and THE
VARIOUS MUNICIPALITIES;

                                    Defendants.

----------------------------------------------------------------------- X

## **CLASS ACTION COMPLAINT**

By and through their undersigned counsel, Plaintiffs hereby file this action and seek class

certification as representatives of a plaintiff class and against Defendants and identified Defendant

Class Representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure.

This case arises from a concerted effort by the Governor of New York State and several

law enforcement departments to suppress Plaintiffs' demonstration at The State University of New

York at Purchase ("SUNY Purchase"), a public liberal arts college in Purchase, New York. On the

evening of May 2, 2024, in keeping with the tradition of student activism, Plaintiffs gathered on the SUNY Purchase lawn to protest the school's complicity in the ongoing genocide committed by the Israeli government in Gaza, which is carried out with the political, military, and financial armament of the United States. In response to this constitutionally protected assembly, Defendants stormed the campus with the intention of shutting down the demonstration, preventing Plaintiffs from continuing their protest, and chilling future gatherings. Police officers from six (6) different municipalities descended upon the protest and, indiscriminately and with excessive force, arrested student protestors, faculty members, and non-participating bystanders, without probable cause.

Defendants' conduct caused serious and, in many cases, lasting physical and emotional injury to members of the class. Thus, Plaintiffs, on behalf of themselves and all others similarly situated, seek damages for all members of the class as well as declaratory and injunctive relief to end SUNY Purchase's unlawful policies and practices with regard to policing and responding to lawful demonstrations.

## JURISDICTION

1.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

2.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3.      The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.

4.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief they pray for herein.

5.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## VENUE

6.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

## PARTIES

7.     Plaintiff SABRINA TAEKO THOMPSON (Ms. Thompson; she/her) is a recent graduate of SUNY Purchase. Ms. Thompson is a resident of the city of New York, county of New York, and state of New York.

8.     Plaintiff LILLIAN PAONE (Ms. Paone; they/them) is a graduate of the State University of New York at Purchase ("SUNY Purchase"). Ms. Paone is a resident of the town of Westfield, county of Union, and state of New Jersey.

9.     Plaintiff RAVEN KARLICK (Mx. Karlick; they/them) is a recent graduate of SUNY Purchase. Mx. Karlick is a resident of the city of New York, county of Kings, and state of New York.

10.     Plaintiff ARYANA ALEXIS ANDERSON (Mrs. Anderson; she/her) is an educator who resides in the city of Binghamton, county of Broome, and state of New York.

11.     Plaintiff SHAKA MCGLOTTEN (Mx. McGlotten; they/them) is an educator who resides in the town of Harrison, county of Westchester, and state of New York.

12.     Defendant KATHY HOCHUL was at all times relevant to this Complaint, and still is, the Governor of New York state. As Governor, Defendant Hochul, at all relevant times, was and is an elected officer and the "State's chief executive," NY State Constitution, Article IV, § 1. As the Governor, she is the commander-in-chief of the New York State Police and National Guard, allowing her to command the police forces to act.

13.     Defendant MILAGROS PEÑA was at all times relevant to this Complaint President of SUNY Purchase and violated Plaintiffs' rights as set forth herein by acting in concert with other Defendants in ordering and effectuating the forceful removal of class members and others engaging constitutionally protected activity on the campus.

14.     Defendant WESTCHESTER COUNTY ("Westchester") is a municipal entity created and authorized under the laws of the State of New York. Westchester is authorized by law to maintain a police department, and maintains the Westchester County Police Department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Westchester assumes the risks incidental to the maintenance of a police force and the employment of police officers.

15.     Defendant CITY OF WHITE PLAINS ("White Plains") is a municipal entity created and authorized under the laws of the State of New York. White Plains is authorized by law to maintain a police department, and does maintain the City of White Plains Police Department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. White Plains assumes the risks incidental to the maintenance of a police force and the employment of police officers.

16.     Defendant TOWN/VILLAGE OF HARRISON ("Harrison") is a municipal entity created and authorized under the laws of the State of New York. Harrison is authorized by law to

maintain a police department, and does maintain the Town of Harrison Police Department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Harrison assumes the risks incidental to the maintenance of a police force and the employment of police officers.

17.    Defendant VILLAGE OF PORT CHESTER ("Port Chester") is a municipal entity created and authorized under the laws of the State of New York. Port Chester is authorized by law to maintain a police department, and does maintain the Port Chester Police Department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Port Chester assumes the risks incidental to the maintenance of a police force and the employment of police officers.

18.    Defendant VILLAGE OF LARCHMONT ("Larchmont") is a municipal entity created and authorized under the laws of the State of New York. Larchmont is authorized by law to maintain a police department, and does maintain the Larchmont Police Department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Larchmont assumes the risks incidental to the maintenance of a police force and the employment of police officers.

19.    Defendant NEW YORK STATE UNIVERSITY POLICE ("UPD") CHIEF DAYTON TUCKER was at all times relevant to this Complaint, and still is, Chief of the department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024. At all relevant times, as Chief of Department, Defendant TUCKER had primary responsibility for UPD operations—that

is, for the police response on the ground. Within the structure of the UPD, all UPD uniformed members of the service were obligated to obey any lawful order given by him.

20.    Defendant NYC DEPARTMENT OF ENVIRONMENTAL PROTECTION ("DEP") SERGEANT FRANK LYNCH, of the Eastview Precinct Command, was at all times relevant to this Complaint, and still is, a member of the New York City Police Department ("NYPD"). He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024. At all relevant times, as assigned Team Leader, Defendant Lynch had primary responsibility for NYC DEP operations— that is, for the police response on the ground. Within the structure of the NYPD, all uniformed members of the service on his team were obligated to obey any lawful order given by him.

21.    Defendant NYC DEP OFFICER CHRISTOPHER SHARP, of the Eastview Precinct Command, was at all times relevant to this Complaint, and still is, a member of the New York City Police Department ("NYPD"). He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

22.    Defendant NYC DEP OFFICER FIRST NAME UNKNOWN ("FNU") SCHWARTZ, of the Eastview Precinct Command, was at all times relevant to this Complaint, and still is, a member of the New York City Police Department ("NYPD"). He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

23.     Defendant UPD INSPECTOR CINDY MARKUS was at all times relevant to this Complaint, and still is, a member of the New York State University Police. She violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

24.     Defendant UPD LIEUTENANT JAMES MCGOWAN was at all times relevant to this Complaint, and still is, a member of the New York State University Police. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

25.     Defendant UPD OFFICER JAMES FOLEY was at all times relevant to this Complaint, and still is, a member of the New York State University Police. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

26.     Defendant POLICE OFFICER MALIK L. BURTS was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

27.     Defendant POLICE OFFICER JAVIER DEJESUS was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful

dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

28.    Defendant POLICE SERGEANT DANIEL S. DUMSER was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

29.    Defendant POLICE SERGEANT MATHIEU E. RICOZZI was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

30.    Defendant POLICE LIEUTENANT PAUL J. CUSANO was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

31.    Defendant POLICE OFFICER MICHAEL P. MAFFEI, was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

32.    Defendant POLICE OFFICER ROBERT L. CAMAJ was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

33.    Defendant POLICE OFFICER BRANDON A. DAY was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

34.    Defendant POLICE OFFICER PAUL S. DESOUSA was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

35.    Defendant POLICE OFFICER JOHN J. SEVERI was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

36.    Defendant POLICE OFFICER NICHOLAS LOPANO was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful

dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

37.    Defendant POLICE OFFICER MARILENA T. SOPHIA was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. She violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

38.    Defendant POLICE OFFICER ELIOT WILDER was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

39.    Defendant POLICE OFFICER RYAN G. WATTS was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

40.    Defendant POLICE SERGEANT TREVOR M. DENNIN was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

41.     Defendant POLICE OFFICER THOMAS C. OLSEN was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

42.     Defendant POLICE OFFICER TUFAN S. DILSCHMANN was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

43.     Defendant POLICE OFFICER TYLER J. SMITH was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

44.     Defendant POLICE LIEUTENANT BRIAN M. HESS was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

45.     Defendant POLICE CAPTAIN JAMES B. GREER was at all times relevant to this Complaint, and still is, a member of the Westchester County Police Department. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in the forceful and unlawful

dispersal, arrest, and/or removal of class members and others engaging in and/or observing protest at the SUNY Purchase campus on May 2, 2024.

46.     Defendant UPD OFFICER MATTHEW ALTO was at all times relevant to this Complaint, and still is, a member of the New York State University Police. He participated in the unlawful conduct set forth herein at the SUNY Purchase campus on May 2, 2024, and represents a class comprised of numerous members of the New York State University Police who violated Plaintiffs' rights as set forth herein.

47.     Defendant POLICE OFFICER GARY MCCORD, Jr. was at all times relevant to this Complaint, a member of the Port Chester Police Department. He personally participated in the unlawful conduct set forth herein at the SUNY Purchase campus on May 2, 2024, including but not limited to ordering members of the class to disperse, and represents a class comprised of numerous members of the Port Chester Police Department who violated Plaintiffs' rights as set forth herein.

48.     Defendant POLICE OFFICER OISIN MCGLOIN was at all times relevant to this Complaint, a member of the Westchester County Police Department. He personally participated in the conduct set forth herein at the SUNY Purchase campus on May 2, 2024, including but not limited to filling out arrest paperwork of class members, and represents a class comprised of numerous members of the Westchester County Police Department who violated Plaintiffs' rights as set forth herein.

49.     Defendant John Doe 9 appeared to be a light-skinned male with dark, short hair, tattoos, and a mole on his right cheek. Upon information and belief, Defendant Doe 9 is employed by UPD. Defendant Doe 9 was personally involved in the arrest of plaintiff Shaka McGlotten.

50.     All of the individual defendants, including Defendant Does 1-10, descended on the protest described herein and were present for but failed to intervene in, and/or participated in the pseudo-encirclement of the protestors, and/or engaged in some of the other conduct alleged below.

51.     All of the individual defendants, including Defendant Does 1-10, were police officers assigned to the police response at the SUNY Purchase quad during the protest on May 2, 2024.

52.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York.

53.     Each and all of the acts and omissions of Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the defendant municipalities and the City and State of New York.

54.     At all relevant times, Defendant police officers were duly appointed officers, employees, or agents of the UPD, the defendant municipalities, and/or the City or State of New York, acting on their behalf and within the scope of their official duties and authority.

55.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

56.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

57.     Each individual Defendant is sued in her or his individual and official capacities.

**COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW**

58.     Plaintiffs timely served Notices of Claim upon Westchester County, City of White Plains, Town/Village of Harrison, Village of Port Chester, and Village of Larchmont.

59.     Plaintiff PAONE attended a hearing at Village of Mt. Kisco/Port Chester pursuant to section 50-h of the New York General Municipal Law on April 4, 2025.

60.     Plaintiff PAONE attended a hearing at Westchester County pursuant to section 50-h of the New York General Municipal Law on July 30, 2025.

61.     Plaintiff THOMPSON attended a hearing at City of White Plains pursuant to section 50-h of the New York General Municipal Law on June 13, 2025.

62.     Plaintiff THOMPSON attended a hearing at Town/Village of Harrison pursuant to section 50-h of the New York General Municipal Law on July 11, 2025.

63.     More than thirty days have elapsed since Plaintiffs served Notices of Claim and none of the defendant municipalities have not offered adjustment or payment thereof.

**JURY DEMAND**

64.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which a jury trial is legally available.

**STATEMENT OF FACTS**

65.     On April 29, 2024, New York State Governor Kathy Hochul wrote a letter to college and university presidents across the state, urging them to "aggressively guard against antisemitism and all forms of hateful or discriminatory rhetoric."

66.     Soon thereafter, on the evening of May 2, 2024, SUNY Purchase students launched a silent sit-in on the campus lawn to protest the ongoing genocide unfolding in Gaza and to demand that their university divest from entities profiting from this genocide, while remaining compliant

with the university's policies regarding protest, as promulgated under 8 NYCRR §535. 8NYCRR §535 prohibits certain conduct—none of which class members were engaged in—while also explicitly protecting the right to free speech and assembly. *See* §535.4 ("no student, faculty or other staff member or authorized visitor shall be subject to any limitation or penalty solely for the expression of his views nor for having assembled with others for such purpose.")

67.     Raise the Consciousness, a student political group, organized this nonviolent protest demanding: financial transparency from the SUNY Purchase Board of Trustees regarding investments with any companies with ties to any defense contractor, weapons manufacturer, or surveillance company, including those with ties to Israel; acknowledgement of the genocide taking place in Gaza; a call for a cease fire; a public apology to SUNY Purchase's Palestinian students whose safety had been disregarded by the Administration; as well as amnesty from academic sanctions in connection with this protest and other nonviolent protests.[1]

68.     Beginning around 5:00 p.m. on May 2, 2024, a group of approximately ten SUNY Purchase students, including Ms. Thompson, gathered on the campus quad to pitch tents, lay tarps, and organize supplies.

69.     Ms. Thompson and two other class members photographed and filmed the setup of this area.

70.     Like most SUNY Purchase students and as encouraged by the school, the Plaintiffs had regularly used the quad for an array of activities in the past, including protest activities.

71.     The SUNY campus quad is located at the center of the Purchase campus, and is a space regularly used by students, faculty, and visitors at all times of day to hang out, play music, study, play games like soccer and Frisbee, and of course protest.

---

[1] https://www.instagram.com/p/C6e8PRDLTUX/?img_index=1

72.    The quad borders a student residence hall and is otherwise surrounded by classrooms and administrative buildings.

73.    The rotunda of the quad is at the center of campus, and you have to cross through the quad to access most places on campus.

74.    For the students and faculty who live on campus, the quad is akin to their backyard.

75.    Between approximately 5:30 pm and 6:30 pm, a handful of Westchester residents (non-students) briefly visited campus to voice support for the protestors and then left without incident.

76.    Ms. Thompson, Ms. Paone, and Mx. Karlick, along with other class members, prepared a shared dinner and reviewed safety guidelines in anticipation of any potential risks or police contact.

77.    At approximately 6:00 p.m., UPD officers approached Ms. Thompson and directed her to remove the tents from the quad lawn.

78.    The class members calmly continued to remain in the tents.

79.    Shortly thereafter, one class member began to lead a chant.

80.    Between 6:00 p.m. and 7:00 p.m., a police force helicopter began circling the quad—an unmistakable sign that police presence was escalating.

81.    At some point shortly thereafter, Legal Observers from the National Lawyers Guild, monitoring the activities taking place on the quad, were instructed to leave by the UPD and escorted to their cars.

82.    Having observed this interaction, several nearby class members, including several of the Class Representatives, pointed out that the campus quad is indeed a public space.

83.    UPD then ordered the class members to dismantle the remaining tents.

84.     The class members complied with this order and quickly removed the tents. UPD did not order the class members to leave at this time.

85.     The class members sat quietly on a single tarp on the grass lawn.

86.     At 9:39 p.m., Patricia Bice, SUNY Purchase Vice President for Student Affairs and Enrollment Management, sent an email to the entire campus community stating: "Today, Thursday evening, a small group of our students attempted to erect an encampment on campus. They were asked to take down the tents and complied," and that "The students are peacefully protesting, as is their right, as long as they follow guidelines and rules set by SUNY and the campus."

87.     By the time "quiet hours" began at 10:00 pm, class members were still sitting quietly, while the police helicopter hovered closely over their heads, making a deafening sound and shining a blinding light.

88.     Shortly after 10:00 p.m., Defendant UPD Chief Dayton Tucker approached the quad and stated, in sum and substance, that the class members could not stay there.

89.     Defendant Tucker claimed that the class members' presence was against "rules," but he failed to explain what rules the class members were allegedly violating or what conduct was violating these rules, or what class members could do to be in compliance with the "rules."

90.     In an exceptionally vague and unclear manner, Defendant Tucker told the class members to leave the "area," without identifying what "area" they needed to leave.

91.     Defendant Tucker and all other Defendants and members of law enforcement who were present failed to tell class members where they could go to continue their protest or to avoid arrest.

92.     This was the first time that class members were asked to leave.

93.     Ms. Paone proceeded to ask Defendant Officer John Doe 10, who may have been Defendant Chief Tucker, which specific regulation of the Student Code of Conduct justified the order to "leave." She asked him to identify the exact rules that demonstrators were in fact violating, or, whether the class members could remain if they honored campus "quiet hours."

94.     Ms. Paone requested that Officer John Doe 10 identify the particular Student Code of Conduct provision at issue and, upon its disclosure, allow the class members a reasonable opportunity to leave.

95.     In turn, Officer John Doe 10 replied, in sum and substance, that he could try to find something, but he never cited any such provision.

96.     Indeed, upon information and belief, throughout the May 2, 2024 demonstration, no officer from either the UPD or the Westchester County Police Department ever identified or cited a single provision of the Student Code of Conduct that the protestors and observers were purportedly violating.

97.     Defendant Tucker further refused to allow the class members a reasonable amount of time to exit the quad, stating in sum and substance that he would not give them that time.

98.     Just minutes later, beginning at around 10:15 p.m., dozens of UPD and Westchester County Police officers converged on the quad, outnumbering the class members.

99.     Westchester County's deployment of police officers to SUNY Purchase on May 2, 2024 was part of an officially authorized and coordinated multi-agency law-enforcement response ("mutual aid").

100.     In fact, the morning after the Plaintiffs' arrests, Westchester County issued a public statement confirming that SUNY Purchase University Police requested mutual aid from the Westchester County Police Department.

101.    Likewise, following the Plaintiffs' arrests, Westchester County Executive George Latimer publicly stated that Westchester County Police were dispatched to the campus at the request of SUNY Purchase and were "assisting in implementing decisions made by the college."[2]

102.    At approximately 10:22 p.m., Defendant UPD Lieutenant James McGowan ("Lt. McGowan") again told class members to leave the area.

103.    At no time did Defendant Lt. McGowan define what the "area" was, provide a reasonable opportunity for the Plaintiffs to comply or provide alternative areas where class members could continue their protest.

104.    Almost immediately thereafter, Lt. McGowan, along with other UPD and Westchester County Police officers, quickly charged towards the class members from the nearby parking lot where they had mobilized.

105.    UPD and Westchester County police officers then aggressively arrested the class members by forcefully pulling or knocking them to the ground, and, with equal aggression, zip tying their wrists.

106.    The class members pleaded with the Defendant police officers to exercise restraint as they witnessed Defendants unleash violence upon the small group of outnumbered class members.

107.     Plaintiff Aryana Alexis Anderson, her husband (a member of the SUNY Purchase faculty), and Mx. McGlotten stood side-by-side near the group of seated class members, closely witnessing the police violently subduing the class members on the ground.

---

[2] https://newyork.news12.com/suny-purchase-students-scared-to-go-outside-after-college-police-raid-encampment

108.    Feeling compelled to do anything in their power to protect the class members, some of whom were their own students, Mrs. Anderson, her husband, and Mx. McGlotten continued to record the arrests as evidence of the unchecked police violence towards the class members.

109.    With an appalling lack of any restraint in their use of force against the class members, the police officers violently tackled a student as he struggled to stand, screaming at him to shut the fuck up and get down.

110.    Defendant police unleashed brutal force as they yanked class members to their feet while their arms were constrained in tight plastic cuffs, with bystanders begging them to calm down many times.

111.    Each Defendant police officer, plainly in uniform and easily identifiable as law enforcement, stood mere footsteps away from the seated, non-violent class members before arrests were effectuated.

112.    Each Defendant police officer had every practical opportunity, whether through direct, verbal commands or simply positioning themselves between the class member and their fellow officers, to prevent the unleashing of brutal, violent, and excessive force on the class members.

113.    None of the Defendant police officers took any steps to intervene to stop the assault on the class members.

114.    Not only did the Defendant police officers fail to intervene, but they also ignored repeated pleas from Mrs. Anderson, Mx. McGlotten, and other faculty observers to stop violently shoving the class members to the ground.

115.    Despite having clear lines of sight to the seated class members, every reasonable opportunity to interpose themselves, and the full authority to immediately halt the use of excessive

force, not a single Defendant police officer intervened, opting instead to stand by as their fellow officers brutally arrested the class members.

116.    As many as four officers charged at one class member, who did not resist arrest in any manner, viciously knocking him to the ground without any regard for the physical harm they were clearly causing him, kneeling on his back and pushing his head into the ground.

117.    Around 10:24 p.m., Defendant Lt. McGowan and several other police officers marched the first wave of arrestees to a police van in the parking lot near the rear entrance of the quad.

118.    The rest of the class members were still seated on the grass.

119.    The remaining officers returned to the quad to complete the next round of arrests.

120.    The police advance intensified shortly thereafter when they proceeded to march towards the last remaining group of class members, including Ms. Thompson and Mx. Karlick.

121.    The police formed a line.

122.     Equipped with shields, batons and guns, the police charged towards the class members, screaming commands, in sum and substance to move back, as they approached without identifying where the class members should go.

123.    As the officers closed in, the remaining class members—now greatly terrified— loudly communicated to the police officers that they were peacefully protesting genocide and that this is a peaceful protest.

124.    Having come within inches of the line of class members, the Defendant police stood facing them for several minutes then suddenly violently shoved their shields into the class members, pushing them onto the ground.

125.    There, another round of violent arrests ensued.

126.    Witnessing the horror, Mx. McGlottten pleaded with the Defendant police to immediately cease their brutal and violent assault on the class members.

127.    Mx. McGlotten then witnessed the Defendant police slamming a class member down onto the hard brick ground.

128.    Yet the Defendant police continued their ceaseless brutality.

129.    Another SUNY Purchase faculty member standing nearby, who was not participating in the protest, implored the Defendant police to leave the quad.

130.    At this point, the Defendant police had already shut down the protest and arrested all the class members.

131.    Without warning, the Defendant police then almost immediately arrested that faculty member, dragging him by the arm from where he was filming, and throwing him to the ground with unnecessarily excessive force.

132.    Mx. McGlotten repeatedly told the police that they were arresting a faculty member.

133.    Moments later, again without warning, Defendant officers arrested faculty observers Mx. McGlotten and Mrs. Anderson—even though neither had participated in the protest.

134.    Several class members who had not taken part in the protest were then also detained.

135.    Multiple arrestees asked the Defendant Police why they had arrested them.

136.    Only at 10:50 p.m. – after the class members were already arrested – did a loudspeaker finally broadcast that protestors could go back to their housing to avoid arrest.

137.    Defendants never told class members where they could go to continue their First Amendment protected activity.

138.    From that point forward, no additional arrests were made at the protest.

139.    The remaining UPD and Westchester County Police Department officers departed the SUNY Purchase campus at approximately 11:30 p.m.

140.    Afterward, when the quad had emptied and the campus was quiet, Plaintiffs' abandoned belongings still laid scattered on the ground—identification cards, medication, cell phones, and academic essentials like laptops and textbooks.

141.    Many items were destroyed and, therefore, unable to be retrieved.

142.    The destruction of these belongings caused challenges for class members financially, personally, and academically.

143.    Without their phones, they could not contact worried family and friends. Without their laptops and books, they lacked essential tools to complete their academic work.

## CLASS REPRESENTATIVES' EXPERIENCES

144.    At all times relevant herein, all class representatives were members of the SUNY Purchase community.

145.    Plaintiffs, many of whom resided on SUNY Purchase's campus as students or faculty members, were lawfully on campus while engaged in First Amendment protected activity.

**Sabrina Taeko Thompson.**

146.    Ms. Thompson participated in the protest at the SUNY Purchase campus on the night of May 2, 2024.

147.    At the time police officers arrived on-scene, Ms. Thompson was sitting on the grass in silence with other class members.

148.    At around 10:30 p.m., Defendant Doe 1, a Westchester County police officer, approached Ms. Thompson and violently assaulted her, causing a bruise on her ribs.

149.     Defendant Doe 2, a Harrison County police officer, assisted in Ms. Thompson's arrest.

150.     Upon information and belief, Harrison officers participated in the May 2, 2024 operation pursuant to an official coordinated response, namely the Westchester County's Mutual Aid & Rapid Response Plan.

151.     Defendant Does 1 and 2 put Ms. Thompson's wrists in extremely tight handcuffs.

152.     Defendant Doe 1 escorted Ms. Thompson, who was compliant, to a transport vehicle while yelling at her to "Stop resisting."

153.     Multiple additional defendant officers participated in Ms. Thompson's arrest, interfering with her first amendment right to assemble and failing to intervene as their colleagues violated Ms. Thompson's rights.

154.     Ms. Thompson was loaded into the transport vehicle and taken to White Plains for arrest processing.

155.     Upon information and belief, prior civil rights litigation and claims against White Plains and White Plains officers—including litigation asserting municipal liability theories— placed White Plains policymakers on notice of recurring allegations of unconstitutional policing and inadequate training and supervision.

156.     In the vehicle on the way to the precinct, Ms. Thompson's glasses were in danger of falling off her face, which was especially terrifying to her, as she has significant visual impairment and cannot see more than a couple feet in front of her without her glasses.

157.     In response to her pleas to officers to push her glasses up further onto her face, Defendant Doe 3, a female officer, laughed at Ms. Thompson and said, in sum and substance, "No, I'm not going to do that."

158.    At the precinct, officers handcuffed Ms. Thompson to a wall and searched her.

159.    At one point, only one of her hands was handcuffed to the wall. Defendant Doe 6 grabbed Ms. Thompson's free hand and slammed it against the wall, while yelling at Ms. Thompson to keep her hands on the wall.

160.    Without justification, Defendant Doe 3 also took Ms. Thompson's glasses off her face and taunted her, saying in sum and substance, "You need these to see, right?"

161.    Ms. Thompson felt unsafe and scared, as she was being touched while unable to see.

162.    Officers then brought Ms. Thompson to a metal detector, which was set off (for reasons unknown to Ms. Thompson, as she had no metal on her and police already had her remove her shoes).

163.    Multiple officers brought Ms. Thompson into a private room and told her to remove her pants and lift up her shirt.

164.    Ms. Thompson was crying and pleading with the officers, but she complied with their orders to push her breasts together and pull them apart multiple times, as well as to pull her pants down to mid-thigh and spread her legs apart.

165.    After approximately 2-3 hours in custody, Ms. Thompson was given a Desk Appearance Ticket for Trespassing and released from custody.

166.    The criminal charge was ultimately dismissed and sealed, consistent with Ms. Thompson's innocence.

167.    As a result of the defendant officers' conduct, Ms. Thompson sustained mental emotional and physical injuries including injuries to her wrists from the excessively tight

handcuffs, a large bruise on the side of her ribs, and pain and stiffness in her back from having her shoulders forcefully pulled back.

168.    Following the arrest, Ms. Thompson experienced debilitating anxiety and fear.

**Lillian Paone.**

169.    Ms. Paone participated in this protest at the SUNY Purchase campus on the night of May 2, 2024.

170.    At the time police officers arrived on-scene, Ms. Paone was sitting on the grass in silence with other class members.

171.    Without provocation or lawful justification, officers started violently pushing, grabbing, and arresting protestors.

172.    Multiple officers shoved Ms. Paone backwards, causing her to fall over a table.

173.    At around 10:30 or 11:00 p.m., Defendant Doe 4 placed metal handcuffs on Ms. Paone's wrists with excessive tightness.

174.    Ms. Paone was loaded into a transport vehicle and taken to Mount Kisco for arrest processing.

175.    After approximately 3 hours in custody, Ms. Paone was given a Desk Appearance Ticket for Trespassing and released from custody.

176.    The criminal charge was ultimately dismissed and sealed, consistent with Ms. Paone's innocence.

177.    As a result of the defendant officers' conduct, Ms. Paone sustained mental emotional and physical injuries including large bruises on her right thigh and calf.

**Raven Karlick.**

178.    Mx. Karlick participated in the protest at the SUNY Purchase campus on the night of May 2, 2024.

179.    At the time police officers arrived on-scene, Mx. Karlick was sitting on the grass in silence with other class members.

180.    At around 10:30 p.m., Defendant Doe 5, who appeared to be a shorter, older white male, placed Mx. Karlick under arrest using excessively tight metal handcuffs.

181.    Defendant Doe 5 sat Mx. Karlick down on a curb, where Mx. Karlick began vomiting.

182.    They were wearing a mask at the time, so they threw up into the mask.

183.    Mx. Karlick was unable to remove the mask themselves because they were handcuffed.

184.    Multiple officers nearby made fun of Mx. Karlick while they were getting sick.

185.    It wasn't until other arrestees begged officers to remove Mx. Karlick's mask from their face that officers did so.

186.    Mx. Karlick was seen by EMT's on site, before being loaded into an ambulance and transported to White Plains Hospital Center by the Harrison Volunteer Ambulance Corps.

187.    Before going to the hospital, Defendants told Mx. Karlick, in sum and substance, that they'd thrown away the medication Mx. Karlick regularly takes for a gastrointestinal condition, which they had brought with them to the quad.

188.    Before going to the hospital, an officer told Mx. Karlick they were no longer under arrest.

189.    Upon discharge from the hospital, however, Defendant Doe 6 informed Mx. Karlick that they were being detained again.

190. Mx. Karlick was given a summons for Trespassing and released from custody.

191. No police officer ever filed Mx. Karlick's summons with the court, consistent with Mx. Karlick's innocence.

192. As a result of the defendant officers' conduct, Mx. Karlick sustained mental emotional and physical injuries including redness, pain, and swelling on their wrists.

193. In addition, the symptoms of their gastrointestinal condition were so triggered and aggravated that they were vomiting blood after the incident.

**Aryana Alexis Anderson.**

194. As discussed in ¶ 133 above, Mrs. Anderson observed, but did not participate in, the protest at the SUNY Purchase campus on the night of May 2, 2024.

195. At the time of the incident, Mrs. Anderson lived on campus with her husband, a faculty member at SUNY Purchase.

196. Mrs. Anderson was a member of SUNY Purchase film faculty at the time this incident took place, but was not teaching courses that semester.

197. On the evening of May 2, 2024, Mrs. Anderson was in her apartment on SUNY Purchase's campus with a colleague, awaiting her husband's arrival for dinner.

198. Mrs. Anderson became worried when her husband was late.

199. Mrs. Anderson and her colleague decided to take a walk across campus to meet her husband.

200. Shortly before 10:30pm, Mrs. Anderson arrived at the quad.

201. She observed a group of class members seated silently in demonstration on the quad.

202.    She noticed police officers nearby wearing riot gear and assembling into what appeared to be a police formation, and started recording on her cell phone.

203.    She continued recording as officers shouted at class members to "Stop resisting," even though they were not, grabbing class members, and handcuffing them.

204.    She observed multiple officers escalate their use of force in effectuating arrests, even going so far as to push and chase the class members.

205.    Mrs. Anderson watched a police officer aggressively pick up a table and she feared for her safety.

206.    At this point, Mrs. Anderson was surrounded by the crowd of protestors and police, sandwiched between the officers who had tackled class members and class members who had not yet been arrested.

207.    Officers pushed the group of people, including Mrs. Anderson who was simply recording, into a tight group, causing them to trip and fall over each other.

208.    At about 10:45 p.m., Defendant John Doe 7 grabbed Mrs. Anderson's left arm and screamed at her to "Stop resisting."

209.    Defendant John Doe 8 then pushed Mrs. Anderson, handcuffed her, and walked her over to sit on the grass near the transport vehicle.

210.    Upon information and belief, Defendant Doe 7 or 8 is the same person as Defendant NYC DEP OFFICER CHRISTOPHER SHARP.

211.    After approximately 4-6 hours in custody, Mrs. Anderson was given a Desk Appearance Ticket for Trespassing and released from custody.

212.    The criminal charge was ultimately dismissed and sealed, consistent with Mrs. Anderson's innocence.

213.    As a result of Defendants' actions, Mrs. Anderson suffered lasting mental health effects.

**Shaka McGlotten.**

214.    Mx. McGlotten is a SUNY Purchase faculty member.

215.    As discussed in ¶ 133 above, Mx. McGlotten observed, but did not participate in, the protest at the SUNY Purchase campus on the night of May 2, 2024.

216.    Mx. McGlotten is a faculty member and was at the quad, observing in that capacity.

217.    At around 10:00 p.m., they were recording Defendants at the quad, showing class members seated on the grass in complete silence.

218.    Defendant Chief Tucker directed Defendant Inspector Markus to ask Mx. McGlotten to tell the class members to disperse.

219.    Mx. McGlotten continued to record the police activities.

220.    At around 10:15 or 10:30 p.m., Defendant Doe 9 placed metal handcuffs on Mx. McGlotten's wrists with excessive tightness before handing them off to another officer.

221.    Mx. McGlotten was loaded into a transport vehicle and taken to Port Chester for arrest processing.

222.    Upon information and belief, prior civil rights litigation and Notices of Claim involving Port Chester and Port Chester officers—including litigation naming Defendant Officer Gary McCord—placed Port Chester policymakers on notice of recurring allegations of unconstitutional arrests and excessive force.

223.    After approximately 3-4 hours in custody, Mx. McGlotten was given a summons for Trespassing and released from custody.

224.    The criminal charge was ultimately dismissed and sealed, consistent with Mx. McGlotten's innocence.

225.    As a result of Defendants' actions, Mx. McGlotten sustained mental, emotional, and physical injuries including numbness, pain, and tingling in both hands, especially their left thumb, from extremely tight handcuffs, for months following this incident.

226.    They were diagnosed with tendinitis and paresthesia, as well as sprains and radial neuritis in both wrists.

## CAUSES OF ACTION

227.    Plaintiffs incorporate by reference paragraphs 1-225 as if fully set forth herein.

## CLASS ACTION ALLEGATIONS

228.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, the Class Representatives SABRINA TAEKO THOMPSON, LILLIAN PAONE, RAVEN KARLICK, ARYANA ALEXIS ANDERSON, and SHAKA MCGLOTTEN seek to represent a certified Plaintiff class consisting of:

(a) all persons who, at the time the SUNY Purchase protest took place on May 2, 2024 on the campus lawn (the "Protest"), had any claims alleged in this Complaint, including, but not limited to, a claim they were:
1. arrested;
2. detained in any fashion, without custodial arrest;
3. subjected to any force;
4. faced any police action that might have or did have any chilling effect; or
5. were otherwise subjected to, without any limitation, any of the policies, practices, and customs alleged elsewhere in this complaint.

For the lack of ambiguity, this includes persons who were subjected to any conduct by employees, agents, or other actors associated with or acting on behalf of Defendants, whether that action was:

1. as part of enforcement action directed at the Protest itself;
2. because of physical proximity to the Protest;
3. because of perceived association with the Protest;
4. because of observation of the Protest, or any attempt or perceived attempt to document police conduct during the Protest in any fashion; or

5.    otherwise because of any connection whatsoever to the Protest.

229.    Plaintiff Class Representatives raise claims that are common to those possessed by all members of the class who are too numerous to be practically joined as individuals in this lawsuit.

230.    In addition, joinder is impractical because, upon information and belief, some members of the Class are not or will be not be aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Upon information and belief, many members of the class are or will be without the means to retain an attorney to represent them in a civil rights lawsuit.

231.    The common questions of fact and law predominate over individual ones that may be dissimilar between class members, including whether there was probable cause for mass arrests, whether the degree of force used was constitutionally appropriate, whether the Class was denied its right to protest, and so on.

232.    These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants. The defendant municipalities' city-wide policies, practices, and customs effectuated at the May 2, 2024 SUNY Purchase protest were a result of a unitary scheme in which Defendants violated the constitutional rights of Class Members. The Class Representatives and all Class Members were and will be victimized by these same retaliatory policies of arresting protestors without legal justification in violation of, *inter alia*, the First, Fourth and Fourteenth Amendments of the United States Constitution, and the New York State Constitution, and thus the foregoing common questions of law and fact greatly predominate over questions affecting only individual members, including legal and factual issues relating to damages.

233. Judicial efficiency and economy will be furthered by recognizing this as a class action.

234. Class Representatives have no interests dissimilar from class members.

235. The claims raised by Class Representatives are also typical of the legal claims possessed by the other class members, in that at the time the Class Representatives' constitutional rights were violated, they were engaging and/or attempting to engage in activities protected by the First Amendment or were simply observing or in the vicinity of such conduct as bystanders. The Class Representatives were the victims of Defendants' policies or arresting, without individualized determinations of probable cause and indeed without probable cause in general, but were instead groups of individuals engaged in lawful political protest and/or mere observation of said protest. The Class Representatives were the victims of excessive and unreasonable force in the course of these unconstitutional arrests and, following their arrests, were detained under conditions that were unreasonable, inhumane, excessive and punitive, all in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

236. The legal claims for which Class Representatives seek declaratory and injunctive relief are the same as or similar to those on which all members of the Class will rely, and the harms suffered by the Class Representatives are typical of the harms suffered by the class members.

237. Class Representatives have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Class, and will fairly and adequately protect the interests of the Class.

238. Moreover, Class Representatives and Class Members still reside on campus at SUNY Purchase, where Defendants' unconstitutional policies, practices and/or customs are

implemented, and therefore remain at high risk of being unconstitutionally harmed in the future pursuant to these policies, practices and customs as they wish to participate in future protests.

239.    Class Representatives are adequate to serve in this role because they were arrested at SUNY Purchase, without legal justification, while attending or observing a protest on May 2, 2024 on campus, their summonses or other charging instruments were later dismissed, and they were subjected to Defendants' Protest Arrest Processing Policies. Plaintiffs are also typical of the members of the Class. Like other members of the Class, Class Representatives were subject to arrests in violation of their First Amendment rights, excessive use of force, and unconditional conditions of confinement.

240.    Class Representatives are represented by Cohen&Green P.L.L.C. ("C&G"); The Aboushi Law Firm PLLC ("Aboushi"), Gideon Orion Oliver ("Oliver"); and Maryam Fatouh.

241.    C&G attorneys have litigated a number of class action and police suits, including, but not limited to: *Sow, et al. v. City of New York, et* al, 21-cv-00533 (S.D.N.Y.) (one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, largest settlement amount paid to protestors in US history); *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), *cert. denied Maguire v. Edrei*, 139 S. Ct. 2614 (2019) (with Oliver)); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

242.    Gideon Oliver has over 16 years of experience litigating civil rights cases against the NYPD, including hundreds of cases challenging the City's policies, practices, and customs related to protest policing. Oliver has frequently co-counseled with BLH attorneys and C&G attorneys in litigation. For example, in addition to litigating other 2004 RNC-related cases, Oliver was Of Counsel to Beldock, Levine & Hoffman attorneys at the summary judgment briefing stage of the *MacNamara* RNC 2004 class action litigation. Ever since, Oliver has always maintained a docket including at least dozens of Plaintiffs' protest-policing related cases. One such recent case was *Edrei* (with C&G).

243.    Tahanie Aboushi has 15 years of experience litigating challenging the NYPD's practice and policies that violate the constitution resulting in policy changes. For example, *Elsayed, v. The City of New York, et al.,* 12-CV-5967(S.D.N.Y.) first individual case challenging the NYPD's removal of religious head coverings during post arrest processing and *Elsayed, et al., v. The City of New York, et al.* 18-cv-10566  (S.D.N.Y) a class action challenging the NYPD's removal of religious head coverings as co-counsel with Beldock, Levine & Hoffman. Ms. Aboushi was lead counsel in *Rolon et al v. City of New York et al.,* 21-cv-02548  (S.D.N.Y) one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, resulting in a historic settlement with the NYPD addressing police response to first amendment activities.

244.    Ms. Fatouh was previously an attorney with the Consumer Compliance Division of AIG, Inc. She has represented university students who have been suspended in Article 78 litigation matters, as well as numerous students who have been disciplined or sanctioned by their respective universities for peaceful protest and organizing. She has also represented university faculty charged with trespass and disorderly conduct during peaceful, non-violent demonstrations in

criminal court. She has represented faculty and students who have faced viewpoint discrimination and professional or academic retaliation by their own universities, as well as university faculty and students subject to investigation by the House Committee on Workforce and Education. She is currently co-counsel to students who are nonparty witnesses in a lengthy litigation involving doxxing and student conduct matters.

245.    Defendant Class Representatives and members of the defendant classes have typical defenses common to the class they have been designated to represent.

246.    Defendant Class Representatives and members of the defendant classes carried out unlawful policies as a unified group, acting in concert in the same unlawful manner.

247.    It is expected that those defending Defendant Class Representatives will vigorously defend the interests of Defendant Class Members who should be accorded the opportunity to opt out of the class and defend themselves individually.

248.    The interests of equity and judicial efficiency strongly favor declaring this a defendant class action and recognizing the designated and named Defendants as Defendant Class Representatives.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

249.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

250.    Upon information and belief, Defendants' seized and arrested Plaintiffs without any judicial warrant authorizing them to seize any Plaintiff. This conduct was unreasonable, and was done without privilege or lawful justification.

251.    Plaintiffs did not consent and were conscious of their confinements by Defendants.

252.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiffs.

253.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

254.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

255.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

256.    Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

257.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

258.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

**First Amendment**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

259.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

260.    In committing the acts and omissions set forth herein, Defendants acted under color of state law, individually and in concert, without lawful justification to deprive Plaintiffs of their rights to speech, expression and to assemble in violation of the First, Fifth, and Fourteenth Amendments to the United States.

261.    Defendants imposed restrictions on protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiffs, in subjecting Plaintiffs to excessive force, in subjecting Plaintiffs to Defendants' protest policing policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

262.    Defendants' retaliatory restrictions Plaintiffs complain of herein imposed upon Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public were themselves regulations on Plaintiffs' protected conduct that:

a. Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or,

b. Were content-neutral but nonetheless lacked sufficiently narrow tailoring to serve a significant governmental interest in that the restrictions substantially burdened more protected speech and/or conduct than was necessary to serve those interests, and/or failed to adequately provide alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened or limited; and/or

c. Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally

significant Due Process-based vagueness and/or overbreadth concerns); and/or

d. Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

263.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

264.     The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## <u>FOURTH CLAIM FOR RELIEF</u>

### First Amendment Retaliation
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

265.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

266.     Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

267.     Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

268.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

269.     Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

270.    Additionally, as discussed elsewhere herein, Defendants designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of the First Amendment rights.

271.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

272.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiffs.

273.    Additionally, the offenses charged against Plaintiffs, which Defendants might argue provided probable cause for Plaintiffs' arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

274.    Each Plaintiff suffered actual chill in that each Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

275.    Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiffs were engaging, before suddenly using force and/or making arrests, without first having given reasonable notice

that such force and/or arrest activity would result if Plaintiffs did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

276.    Additionally, as discussed elsewhere herein, Defendants designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiffs subjected Plaintiffs to the violations of their First Amendment rights described elsewhere herein.

277.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

278.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

**Due Process**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

279.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

280.    In addition to the Due Process violations described above, Plaintiffs hereby mount an as-applied, Due Process-based challenge to the application of N.Y.S. Penal Law § 140.05 to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

281.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbreadth, such that their enforcement against

Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning and/or instructions on where Plaintiffs could continue engaging in their First Amendment-protected activity.

282.    Additionally, as discussed elsewhere herein, Defendants designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

283.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

284.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

**Deprivation of Fair Trial Rights**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution***

285.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

286.    Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiffs suffered liberty deprivations and other injuries.

287.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

288.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SEVENTH CLAIM FOR RELIEF

**Malicious Prosecution**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

289.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

290.    Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiffs, including by supplying and creating false information that was included in police paperwork and providing falsely sworn information in accusatory instruments.

291.    Defendants misrepresented and falsified evidence and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence.

292.    Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiffs.

293.    Defendants acted with malice in initiating criminal proceedings against Plaintiffs.

294.    Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiffs were favorably terminated.

295.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

296.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## EIGHTH CLAIM FOR RELIEF

### Violations of the New York State Constitution

297.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

298.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities and/or the City or State of New York, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

299.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

300.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

301.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

302.     The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

<strong><u>NINETH CLAIM FOR RELIEF</u></strong>

<strong>Violations of New York State Common Law</strong><br><strong><em>Assault</em></strong>

303.      Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

304.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities and/or the City or State of New York, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

305.     Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

306.     Defendants did thereby inflict assault upon the Plaintiffs.

307.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

308.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## TENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
### *Battery*

309.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

310.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities and/or the City or State of New York, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

311.    Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

312.    Defendants did thereby inflict battery upon the Plaintiffs.

313.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

314.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### ELEVENTH CLAIM FOR RELIEF

**Violations of New York State Common Law**
*Conversion*

315.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

316.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities and/or the City or State of New York, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

317.    Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiffs' personal property in derogation of Plaintiffs' rights.

318.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

319.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### TWELFTH CLAIM FOR RELIEF

**Violations of New York State Common Law**
*False Arrest, False Imprisonment, and Unreasonable Detention*

320.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

321.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities and/or the City or State of New York, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

322.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement, and it was without their consent.

323.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

324.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
### *Negligent Training and Supervision*

325.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

326.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of the defendant municipalities and/or the City or

State of New York, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

327.    Upon information and belief, the defendant municipalities supervised and trained the police officials described above.

328.    The acts and conduct of the police officials were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

329.    Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

330.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

331.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
### *Excessive Detention*

332.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

333.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or

while they were acting as agents and employees of the defendant municipalities and/or the City or State of New York, clothed with and/or invoking state power and/or authority, and, as a result, the defendant municipalities are liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

334.    Defendants deliberately detained protesters for excessive and unreasonably prolonged periods of time.

335.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

336.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them

## SIXTEENTH CLAIM FOR RELIEF

### Violations of New York Civil Rights Law § 79-P Right To Record

337.    Plaintiffs hereby reallege and incorporate by reference all of the preceding paragraphs as though they were fully set forth herein.

338.    Prior to their assault, battery, and arrest, Plaintiffs were exercising their rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity.

339.    225.    In arresting Plaintiffs, Defendants exceeded their authority because their conduct was inconsistent with New York Civil Rights Law § 79-P and the Federal Constitutional.

340.    All Defendants violated New York Civil Rights Law § 79-P in that Plaintiffs were while they "exercised or attempted to exercise the right established in subdivision two of this

section to record a law enforcement activity and an officer acted to interfere with that person's recording of a law enforcement activity" in one of the specified ways.

341.    Defendants unlawfully arrested Plaintiffs to deter them from exercising their right to record law enforcement activity.

342.    New York Civil Rights Law § 79-P creates a private right of action that explicitly provides for punitive damages and injunctive relief, as well as mandatory attorneys' fees and expert fees.

343.    New York Civil Rights Law § 79-P defines "record" and the related right in extremely broad terms.

344.    Specifically, the law creates a right of action to sue for any law enforcement interference with the right, including "attempting to prevent [a] person from recording law enforcement activity."  New York Civil Rights Law § 79-P(3)(i); *see also*, *id* § (iv).

345.    Similarly, there is a cause of action where an officer — regardless of the fact of recording — engages in "commanding that the person cease recording law enforcement activity when the person was nevertheless authorized under law to record," as happened here.  New York Civil Rights Law § 79-P(3)(iii).

346.    Thus, the statute creates a right of action, and that right — like the similar First Amendment right — "does not depend on whether [a plaintiff's] attempt to videotape was frustrated" (Gericke v. Begin, 753 F.3d 1, 3 n.2 (1st Cir. 2014)), or for that matter, only intended to create the impression someone was recording.

347.    Defendants' actions and policies alike violate New York Civil Rights Law § 79-P such that all the remedies available thereunder are appropriate.

**DEMANDS FOR RELIEF**

**WHEREFORE**, Plaintiffs demand the following relief against Defendants:

i.  Enter an order certifying this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs SABRINA TAEKO THOMPSON, LILLIAN PAONE, RAVEN KARLICK, ARYANA ALEXIS ANDERSON, and SHAKA MCGLOTTEN as Class Representatives;

ii.  Issue a class-wide declaratory judgment;

iii.  Issue a permanent injunction enjoining Defendants from violently disrupting protests;

iv.  Issue a permanent injunction enjoining Defendants from engaging in the conduct described herein;

v.  Retain jurisdiction in this case until the unlawful conditions, practice, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

vi.  Award Plaintiffs compensatory and punitive damages in amounts that are fair, just and reasonable, to be determined at trial;

vii.  Award Plaintiffs, and the members of the class, reasonable attorneys' fees and costs; and

viii.  Grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

[Signatures on Following Page]

Dated: January 9, 2026
　　　　Queens, NY

**COHEN&GREEN P.L.L.C.**

Elena L. Cohen
J. Remy Green
Regina Yu
Leena M. Widdi
Maryam Fatouh *(pro hac vice)*
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
elena@femmelaw.com

**THE ABOUSHI LAW FIRM P.L.L.C.**

Tahanie A. Aboushi, Esq.
1441 Broadway, 5th Floor
New York, NY 10018
t: (212) 391-8500
tahanie@aboushi.com

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: (718) 783-3682
Gideon@GideonLaw.com